FILED

2023 Jul-26  AM 09:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **DANIEL POSEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:21-cv-00028-MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Daniel Posey has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Posey's claim for supplemental security income based on an Administrative Law Judge's finding that Mr. Posey was not disabled.  (Doc. 10-3, pp. 16-26).  Mr. Posey argues that the Administrative Law Judge—the ALJ—improperly rejected his testimony concerning his pain and other symptoms and improperly evaluated the opinion of treating physician Dr. Graham.  Mr. Posey also challenges the constitutional appointment of the ALJ and her refusal to reopen a previous disability application. After careful consideration of the administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## LEGAL STANDARD FOR SOCIAL SECURITY AMINISTRATION PROCEEDINGS

To succeed in his administrative proceedings, Mr. Posey had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited March 8, 2023).

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  "The claimant has the burden of proof with respect to the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy."  *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Mr. Posey first applied for disability and supplemental security income benefits on January 22, 2015.  After ALJ Mary Helmer held a hearing on May 11, 2017, she issued an unfavorable decision on June 9, 2017, finding that Mr. Posey was not disabled.  (Doc. 10-4, pp. 19-28).  The Appeals Council denied Mr. Posey's request for a review on April 26, 2018; Mr. Posey did not appeal that final decision to a federal district court.  (Doc. 10-4, pp. 33-38).

On May 22, 2018, Mr. Posey reapplied for a period of SSI benefits and alleged that his disability began April 27, 2018.  (Doc. 10-6, p. 2).  The Commissioner initially denied Mr. Posey's claims, and Mr. Posey requested a hearing before an ALJ.  (Doc. 10-3, p. 16).  Mr. Posey appeared at a hearing before ALJ Helmer on February 27, 2020; his attorney attended the hearing too. (Doc. 10-3, p. 32).  A vocational expert testified at the hearing.  (Doc. 10-3, p. 32).

ALJ Helmer issued an unfavorable decision on April 10, 2020.  (Doc. 10-3, p. 13).  On November 4, 2020, the Appeals Council declined Mr. Posey's request

for review, (Doc. 10-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  See 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Posey's Medical Records*

To support his application, Mr. Posey submitted medical records relating to the treatment and diagnosis of carpal tunnel syndrome, hypertension, depression, obstructive sleep apnea, gastroesophageal reflux disease, status post cholecystectomy, and asthma.  Mr. Posey also submitted medical records dating to 2008 that relate to the treatment and diagnosis of low back pain, lumbar spondylosis, disc disease, midthoracic pain, and thoracic spondylosis.  The Court has reviewed Mr. Posey's complete medical history and summarizes the following medical records because they are most relevant to Mr. Posey's arguments in this appeal.

In 2008, Mr. Posey "fell flat on his back" off a stool while "welding at Ox Bodies company." (Doc. 10-8, p. 54, 150).  In May 2010, Dr. Fred Graham, a pain specialist with West Alabama Spine & Pain Specialists, diagnosed Mr. Posey with lower back pain, lumbar spondylosis, disc disease, midthoracic pain, and thoracic spondylosis. (Doc. 10-8, p. 62).  Over the next three years, Dr. Graham and his nurse practitioner, Jessica Hester, treated Mr. Posey for back pain with prescription pain medications and epidural steroid injections in his spine.  Despite the treatment, Mr. Posey's back pain became worse. (Doc. 10-8, pp. 62-77).  In May 2012, Mr. Posey

reported that he was "holding out as long as he [could] before he [saw] a surgeon" and that taking 350mg of Soma to treat his muscle pain together with 10 mg of Lortab for pain made his back pain "tolerable." (Doc. 10-8, p. 81). In 2012, Mr. Posey received several epidural steroid injections for his back pain and complained of numbness, tingling, and increased pain in his legs. (Doc. 10-8, pp. 82-86, 87).[2]

At his January 10, 2013 appointment with CRNP Hester, Mr. Posey reported increased pain in his legs and lower back, "locking" in his lower back, tingling in his legs, and a "[d]ecreasing response to [epidural] blocks." (Doc. 10-8, p. 88). CRPN Hester changed Mr. Posey's pain medications from Lortab 10 mg to Norco 10 mg, referred him to spinal neurosurgeon Dr. Bryan Givhan, and scheduled Mr. Posey for an MRI of his lumbar spine. (Doc. 10-8, pp. 90-91). The January 22, 2013 MRI of Mr. Posey's lumbar spine showed a "small central disc bulge and annular tear" at L4-L5 and "[b]ilateral pars defects" at L5-S1, both with no nerve impingement. (Doc. 10-8, p. 92).[3]

_____

[2] In the "Review of Systems" sections throughout Dr. Graham's and CRNP Hester's records from September 2012 to March 2017, the notes say, "Patient doing well," but in the "History of Present Illness" section of each record for each visit, the note describes Mr. Posey's specific complaints on that day. The Court suspects that the "Review of Systems" sections were not changed for each visit because sometimes Mr. Posey's specific complaints for a visit indicated he was not doing well. *See* (Doc. 10-8, pp. 84, 89, 94, 98, 102, 108, 112, 116, 120, 124, 129, 133, 137, 141, 145).

[3] A pars defect is a "unilateral or bilateral fracture involving the pars interarticularis of the posterior vertebral arch," and occurs "most often at L5." *See* https://www.ncbi.nlm.nih.gov/books/NBK538292/.

Mr. Posey saw Dr. Givhan at West Alabama Neurosurgery & Spine on February 12, 2013 for a surgical consultation.  (Doc. 10-8, pp. 19-22).  During that consultation, Mr. Posey stated that "his back pain ha[d] become so intolerable that he barely [could] ambulate through the day."  (Doc. 10-8, p. 19).  Mr. Posey indicated he had "severe back pain, which radiate[d] to his hips" but "[did] not radiate down his legs."  (Doc. 10-8, p. 19).  Dr. Givhan's examination of Mr. Posey's back showed "mild pain to palpation and mild pain on both extension and flexion maneuvers," with "minimal paraspinous spasm."  (Doc. 10-8, p. 22).  Dr. Givhan noted that Mr. Posey had "long standing severe chronic low back pain."  (Doc. 10-8, p. 22).

When Mr. Posey returned to see Dr. Gihvan on February 28, 2013, Dr. Givhan explained to Mr. Posey that "even with surgery . . . [Dr. Givhan did] not think [Mr. Posey was] ever going to be completely pain-free."  (Doc. 10-8, p. 18).  Mr. Posey wanted to pursue surgery because he could "no longer tolerate his symptoms."  (Doc. 10-8, p. 18).

On April 22, 2013, Dr. Givhan performed a lumbar fusion on Mr. Posey.  (Doc. 10-8, pp. 34-36).  Dr. Givhan's surgical notes indicated that, before surgery, Mr. Posey "had multiple conservative therapies including over 20 epidural steroid injections, physical therapy and medical treatment, all of which ha[d] been

ineffective." (Doc. 10-8, p. 35). Dr. Givhan placed "bilateral pedicle bone screws" at L4, L5, and SI and placed 60 mm rods in the screw heads. (Doc. 10-8, p. 36).

Mr. Posey returned to CRNP Hester on May 20 and September 9, 2013 for follow-up examinations. (Doc. 10-8, pp. 93-100). The notes from those visits indicate that Mr. Posey was wearing a back brace, prescribed for 12 weeks, and reported that his back was "not grinding back there anymore but it still hurt[] when [he walked].'" (Doc. 10-8, pp. 93, 97). Mr. Posey told CRNP Hester that he did well for two months but his "pain ha[d] [] returned." (Doc. 10-8, p. 97). He also reported "tingling and numbness in his legs." (Doc. 10-8, pp. 93, 97). At his September 2013 follow up, Mr. Posey reported that he had seen Dr. Givhan twice since his surgery, and "Dr. Givhan [t]old him that everything [was] fusing together good." (Doc. 10-8, p. 97). CRNP Hester continued Mr. Posey on Norco 10mg and Soma 350mg for his pain. (Doc. 10-8, p. 100).

On February 24, 2014, Mr. Posey returned to CRNP Hester complaining of numbness and tingling in his legs. (Doc. 10-8, p. 101).[4] Mr. Posey rated the severity of his pain as "7-8 on 0/10 scale." (Doc. 10-8, p. 101). CRNP Hester ordered a CT Myelogram of Mr. Posey's lumbar spine. (Doc. 10-8, p. 104). The February 28, 2014 evaluation showed minimal annular bulging with no nerve root impingement

---

[4] Nurse Hester noted that "[n]umbness in [Mr. Posey's] legs is a new complaint," despite Mr. Posey's complaints of numbness in his legs on his two previous visits. (Doc. 10-8, pp. 93, 97, 102).

and bilateral pars defect of L4-L5 "held in fixation by pedicle screws and interbody fusion plug." (Doc. 10-8, p. 105).

On July 7, 2014, Mr. Posey returned to CRNP Hester complaining that he was "overall worse." (Doc. 10-8, p. 107). He rated his pain as "7-8 on a 0/10 scale." (Doc. 10-8, p. 107). Mr. Posey reported "decreased sensation to both feet" and stated that he had "fallen a couple of times due to weakness in his legs." (Doc. 10-8, p. 107). CRNP Hester added Flexeril 10mg and Lyrica 75mg to Mr. Posey's prescriptions for Norco 10mg and Soma 350mg. (Doc. 10-8, p. 110).

Mr. Posey returned to Dr. Givhan on April 9, 2015 after a fall. Mr. Posey reported "worsening pain in his low back." (Doc. 10-8, p. 14). Dr. Givhan noted that Mr. Posey "ha[d] mechanical back pain, which ha[d] been a longstanding problem for him." (Doc. 10-8, p. 15). A neurologic exam was largely normal, but Mr. Posey had "some nondermatomal diminished pinprick in his feet bilaterally" and "pain to palpation in the lumbosacral region and pain on both extension and flexion maneuvers." (Doc. 10-8, pp. 14-15). CT and x-rays later that month showed that Mr. Posey had broken his pedicle screws at S1; there was "[m]inimal associated spondylolisthesis at L5-S1 only, where there [were] associated broken pedicle screws at S1." (Doc. 10-8, p. 24).

Mr. Posey saw Dr. Givhan again on April 23, 2015 to discuss the results of his imaging. Dr. Givhan acknowledged the fractured screws but stated that Mr.

Posey "appear[ed] to have spontaneously fused." (Doc. 10-8, p. 13). Dr. Givhan "strongly recommend[ed] against hardware removal or any other intervention in this particular case" because of the spontaneous fusion. (Doc. 10-8, p. 13). Dr. Givhan stated that Mr. Posey "ha[d] a long history of chronic back pain, and he [was] likely going to have this for the rest of his life but, again from surgical standpoint, we do not recommend further intervention in this nice gentleman's case." (Doc. 10-8, p. 13).

Mr. Posey saw CRNP Hester again on May 18, 2015, complaining of "mid and low back pain that radiate[ed] down both legs" and numbness and tingling in his legs. (Doc. 10-8, p. 119). Mr. Posey had normal range of motion in all joints and was able to walk without assistance. (Doc. 10-8, p. 120). CRNP Hester increased Mr. Posey's Lyrica 75mg from twice to three times a day. (Doc. 10-8, p. 122).

By September 9, 2015, Mr. Posey reported to CRNP Hester that the "pain medications [were] no longer holding," he was in "constant severe pain and ha[d] great difficulty getting into a comfortable position," and he rated the severity of his pain as "9/10." (Doc. 10-8, pp. 123-24).[5] CRNP Hester stated that "Dr. Givhan confirmed via x[-] ray that [Mr. Posey's] bottom two screws [were] broken." (Doc. 10-8, p. 123). Mr. Posey reported bruising on his lower back at the site of the broken

---

[5] Despite Mr. Posey's report of a severe pain level of 9/10, the "Symptoms Related to Pain" section indicates: "PAIN IS ALLEVIATED BY: medications, frequent change in positions." (Doc. 10-8, p. 123).

pedicle screws.   (Doc. 10-8, p. 123).   CRNP Hester's notes indicate that she "support[ed] patient filing for disability and [would give] him a recommendation letter if needed."   (Doc. 10-8, p. 126).   CRNP Hester discontinued the Norco prescription and started Mr. Posey on "Percocet 10/325mg QID PRN" for his severe pain.  (Doc. 10-8, p. 126).

Mr. Posey saw CRNP Hester on December 30, 2015 and May 16, 2016, for severe pain which he rated at a 9/10.  (Doc. 10-8, pp. 128-135).  Mr. Posey told CRNP Hester that Dr. Givhan could not remove the two broken screws in his back. (Doc. 10-8, p. 132).  Mr. Posey stated he "would like a second opinion."  (Doc. 10-8, p. 132).  CRNP Hester noted that she believed that "if [Mr. Posey] could have the[] broken screws removed[,] [] his pain would decrease tremendously," and he "could possibly come off of the pain medications."  (Doc. 10-8, p. 132).   CRNP Hester stated that she "believe[d] that the broken hardware [was] a significant cause of his continuous pain" and concurred with Mr. Posey's suggestion that a second opinion about removal of the broken screws was advisable.  (Doc. 10-8, pp. 132-33). CRNP Hester increased Mr. Posey's prescription of Lyrica from 75mg to 100mg three times a day.  (Doc. 10-8, p. 135).

At an August 8, 2016 visit, Mr. Posey reported numbness, tingling, and weakness in both legs, which was aggravated by "[l]aying down caus[ing] [the] pain to shoot down both legs."  (Doc. 10-8, p. 136).  Mr. Posey rated the severity of pain

at the time of treatment a "7/10." (Doc. 10-8, p. 136). CRNP Hester noted that Mr. Posey "continue[d] to be in constant severe pain in his low[er] back and ha[d] great difficulty getting in a comfortable position when standing or sitting." (Doc. 10-8, p. 136).

During an office visit with Dr. Graham on December 12, 2016, Mr. Posey stated that he "continue[d] to be in constant severe pain in his low back" and rated his pain as a 7/10 while taking Percocet, Flexeril, and Lyrica. (Doc. 10-8, p. 140). Mr. Posey reported that he had "great difficulty getting in a comfortable position when standing or sitting," and that "[h]e [was] unable to stand up for a long period of time." (Doc. 10-8, p. 140). Mr. Posey stated that he could only "sit around the house doing nothing," had "gained weight due to inactivity," and had to "go up a pants size." (Doc. 10-8, p. 140). Dr. Graham noted that he "highly recommend[ed] Mr. Posey get a second opinion" regarding the removal of the broken screws in his back. (Doc. 10-8, p. 142).

Mr. Posey returned to Dr. Graham on March 20, 2017, complaining of "increased numbness and tingling all the way down into his feet," which was "worse at night." (Doc. 10-8, p. 144). Mr. Posey reported that his left leg had "begun to give away on him if [] standing up for prolonged periods." (Doc. 10-8, p. 144). Mr. Posey reported that he "continue[d] to be in constant severe pain to his low back and his pain medication [did] help most days to keep it manageable." (Doc. 10-8, p.

144).  Mr. Posey rated his pain at this visit as a 7/10.  (Doc. 10-8, p. 144). Dr. Graham's physical examination showed muscle strength of "greater than 4/5 throughout all extremities in major muscle groups; equal and symmetric deep tendon reflexes; and normal sensation in all extremities.  (Doc. 10-8, p. 146).  Dr. Graham referred Mr. Posey for an updated MRI.  (Doc. 10-8, p. 144).  The MRI showed no "definite new abnormality" and no "neural impingement."  (Doc. 10-8, p. 148).  The MRI showed that the "hardware appear[ed] intact" but details of the hardware could not be seen on the MRI.  (Doc. 10-8, p. 148).

During a visit with Dr. Graham was on June 12, 2017,  Mr. Posey complained of "constant" "[l]ow back pain radiating into both lower extremities," and he rated his pain at a 6/10.  (Doc. 10-8, p. 149).  Mr. Posey stated that "[s]itting too long or twisting cause[d] numbness and tingling to [sic] flair."  (Doc. 10-8, p. 149).  Dr. Graham's physical examination of Mr. Posey revealed lower back pain in both legs; no muscle atrophy; 5/5 muscle strength in Mr. Posey's hips, knees, ankles, feet, arms, and wrists; and grade 3/4 reflexes in his legs, feet, arms, and wrists.  (Doc. 10-8, pp. 150-51).  Dr. Graham performed a "[t]heraputic left L5-S1 transforaminal epidural" on Mr. Posey on June 20, 2017.  (Doc. 10-8, p. 153).

On September 6, 2017 and January 15, 2018, Mr. Posey returned to Dr. Graham and reported that his pain was a 6/10 at both visits.  (Doc. 10-8, pp. 154-61).  Dr. Graham's physical examination of Mr. Posey again revealed lower back

pain and pain in both legs. (Doc. 10-8, pp. 155, 159). At the January 15 visit, Mr. Posey indicated that he had taken "extra [Percocet] some days due to the severity of his pain level" and requested "something to take in between the Percocet for his pain." (Doc. 10-8, p. 158). Dr. Graham's notes indicated that he instructed Mr. Posey to take his pain medications only as prescribed. Dr. Graham declined to "add or increase patient's pain medications at all." (Doc. 10-8, p. 160). Dr. Graham ordered an "LSO back brace" for Mr. Posey. (Doc. 10-8, p. 160).

During his April 11, 2018 visit with Dr. Graham, Mr. Posey reported constant low back pain at an 8/10 on the pain scale, and Dr. Graham's physical examination of Mr. Posey was positive for lower back and leg pain. (Doc. 10-8, pp. 163, 165). When Mr. Posey returned to Dr. Graham on August 1, 2018, Mr. Posey stated that "his low back pain [was] constant and sharp to dull with radiation down [both legs] down to his feet." (Doc. 10-10, p. 70). Mr. Posey rated the severity of his pain as an 8/10 while taking Percocet, Flexeril, and Lyrica for his pain. (Doc. 10-10, p. 70). Dr. Graham noted that Mr. Posey's pain was "alleviated by: rest, medication, getting up, [and] moving around from sitting too long." (Doc. 10-10, p. 70). Dr. Graham's physical examination revealed the same results as the previous examinations; Mr. Posey was positive for both lower back and leg pain. (Doc. 10-10, p. 72). Mr. Posey stated that his "LSO PRN" brace "help[ed] to an extent." (Doc. 10-10, p. 70). Dr.

Graham changed Mr. Posey's pain medication from Percocet 10mg to Oxycodone 10mg.  (Doc. 10-10, p. 72).

On October 24, 2018, Mr. Posey saw CRNP Hester and reported that "his pain [was] worse in his legs, mainly on the left."  (Doc. 10-10, p. 74).  He rated the severity of his pain as an 8/10.  (Doc. 10-10, p. 74).  CRNP Hester changed Mr. Posey's Oxycodone 10mg back to Percocet 10mg because Mr. Posey reported that Oxycodone was not as helpful as Percocet.  (Doc. 10-10, pp. 74, 76).

Mr. Posey returned to Dr. Graham on February 13, 2019, and May 8, 2019, complaining of severe back pain at a 7/10 on the pain scale.  (Doc. 10-10, pp. 78-81, 82-85).  During the May 2019 visit, Mr. Posey stated that he was "doing well" on his medications and reported that his LSO brace "help[ed] to an extent."  (Doc. 10-10, p. 82).[6]  On July 31, 2019, Mr. Posey reported that his lower back pain "remain[ed] constant and sharp" and that "depending on positioning and activity his LBP radiates to BIL LE down to his feet." (Doc. 10-10, p. 86).  Mr. Posey reported the severity of his pain at a "7-8/10" but did not complain of tingling or weakness. (Doc. 10-10, p. 86).  Dr. Graham's physical examinations of Mr. Posey during these

---

[6] Dr. Graham's note under "History of Present Illness" for this visit indicates that Mr. Posey was taking Oxycodone, Flexeril, and Lyrica, (Doc. 10-10, p. 82), but CRNP Hester had previously changed his Oxycodone prescription to Percocet, and the "Assessment/Plan" section for this visit indicates that Mr. Posey should "continue current medications: Percocet 10mg TID PRN[,] Flexeril 10 mg TID PRN[, and] Lyrica 150 mg PO TID."  (Doc. 10-10, p. 84).

2019 visits showed no muscle atrophy, normal muscle strength, and normal deep tendon reflexes. (Doc. 10-10, pp. 80, 83-84, 88).

At a September 25, 2019 follow-up, Dr. Graham noted that Mr. Posey's "LBP (controlled) [was] constant," that the "severity varie[d] with activity," and that it "ache[d], throb[bed], [was] occasionally sharp, and radiated to [both legs]." (Doc. 10-10, p. 90). Mr. Posey rated the severity of his pain at this visit as a 7/10. (Doc. 10-10, p. 90). Dr. Graham ordered Mr. Posey a "Orthocor PEMF device for management of pain, inflammation, and swelling" and noted that Mr. Posey had "tried with minimal relief other conservative measures including OTC and Rx medication, physical therapy and TENS unit." (Doc. 10-10, p. 92).

During a November 20, 2019 appointment with Dr. Graham, Mr. Posey rated his pain as "moderate 5-7 on 1/10 scale" and complained of numbness and tingling in his legs and feet. (Doc. 10-10, p. 94). Mr. Posey stated that "walking[sic] [and] sitting too long" aggravated his pain, but "rest, medication, getting up, [and] moving around from sitting too long" helped his pain. (Doc. 10-10, p. 94). Dr. Graham, after recommending that "Mr. Posey have a second opinion" about the removal of

the broken hardware in his back, stated that Mr. Posey should "[c]onsider SCS trial if no surgery is possible." (Doc. 10-10, p. 96).[7]

On January 13, 2020, Mr. Posey returned to Dr. Graham, complaining of lower back pain radiating into his lower extremities. (Doc. 10-10, p. 98). Mr. Posey ranked the severity of his pain at an "8/10" and stated that the pain was "worsening with, 'real sharp pain when I turn a certain way' with radiation down [both legs] to his toes." (Doc. 10-10, p. 98). Mr. Posey "state[d] the brace [did] not help him." (Doc. 10-10, p. 98). Dr. Graham's notes indicated that a "[s]econd opinion for lumbar surgery ha[d] been requested from worker's comp at his last OV on 11/20/19. He ha[d] not heard anything" as of the January 2020 appointment. (Doc. 10-10, p. 100). Dr. Graham stated that he "would like [Mr. Posey] to see Dr. Theiss if possible," regarding the removal of his hardware. (Doc. 10-10, p. 100).

### Dr. Graham's First Clinical Assessment of Pain

For Mr. Posey's 2015 disability application, Dr. Graham completed a "Clinical Assessment of Pain" on July 29, 2015 at the request of Mr. Posey's attorney. (Doc. 10-8, p. 167). Dr. Graham opined that Mr. Posey's "[p]ain [was] present but [did] not prevent functioning in everyday activities or work." (Doc. 10-

---

[7] A "SCS trial" is a temporary medical device implanted under the skin "that sends low levels of electricity directly into the spinal cord to relieve pain." "Spinal cord simulation is used most often after nonsurgical pain treatment options have failed to provide sufficient relief." *See* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/treating-pain-with-spinal-cord-stimulators (last visited July 21, 2023).

8, p. 167). Dr. Graham noted that "on occasion" pain "may be" "present to such an extent as to be distracting to adequate performance of daily activities and/or work." (Doc. 10-8, p. 167). Dr. Graham also opined that "physical activity such as walking, standing, bending, stooping, [and] moving of extremities" would cause "some increase [in Mr. Posey's pain] but not to such an extent as to prevent adequate functioning in such task." (Doc. 10-8, p. 167). Dr. Graham stated that Mr. Posey's "pain and/or prescribed medication" would cause "[s]ome limitations" in Mr. Posey's ability to work but "not to such a degree as to create serious problems in most instances." (Doc. 10-8, p. 168). Regarding Mr. Posey's "long-term prospects for recovery" from the pain, Dr. Graham stated that "[a]lthough pain may be less intense or less frequent in the future, it will still remain a significant element in this person's life." (Doc. 10-8, p. 168). Additionally, Dr. Graham noted that Mr. Posey had stated "he has 2 screws 'broken' from prior lumbar surgery. CT from 2/28/14 doesn't show this. Dr. Givhan may have more recent imaging." (Doc. 10-8, p. 169).

*Administrative Assessment by Dr. Sellman*

After Mr. Posey re-applied for disability benefits, Dr. Gloria Sellman conducted a disability determination assessment of Mr. Posey on July 16, 2018 at the request of the Social Security Administration. (Doc. 10-4, pp. 9-13). Dr. Sellman reviewed Mr. Posey's records and summarized Dr. Graham's and Dr. Givhan's treatment notes that included Mr. Posey's prior lumbar surgery and broken

pedicle screws.  (Doc. 10-4, p. 11).  Dr. Sellman found that Mr. Posey's impairments "could reasonably be expected to produce some of the stated [symptoms] and functional limitations, but not the degree alleged."  (Doc. 10-4, p. 9).  Dr. Sellman pointed to the facts that the 2017 MRI showed no new definite abnormalities, Mr. Posey's "post op changes appear[ed] unremarkable"; he had spontaneous fusion at L5-S1 despite the broken pedicle screws;  the surgeon recommended against hardware removal; and the CTs showed no "lateralizing disc herniation."  (Doc. 10-4, p. 9).  Dr. Sellman also noted that Mr. Posey "reported no change[] in his condition since [the] AC denial [on] 4/26/2018."  (Doc. 10-4, p. 9).  Consequently, Dr. Sellman found that Mr. Posey's "statements regarding [his] functional limitations [were] considered only partially consistent with objective evidence in [the] file."  (Doc. 10-4, p. 9).

Dr. Sellman assessed Mr. Posey's residual functional capacity and opined that Mr. Posey could occasionally lift 20 pounds; frequently lift 10 pounds; and stand, walk, and sit with normal breaks for "6 hours in an 8-hour workday."  (Doc. 10-4, p. 10).  Dr. Sellman also found that Mr. Posey had no limitations in pushing and pulling; occasionally could climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally could stoop, kneel, crouch, and crawl; and frequently balance; and should avoid "dangerous machinery and unprotected heights."  (Doc. 10-4, pp. 10-11).  Based on these findings, Dr. Sellman concluded that Mr. Posey

could perform light work as a bender, booker, or garment steamer, all of which existed at significant numbers in the national economy.  (Doc. 10-5, p. 13).

*Dr. Graham's Second Clinical Assessment of Pain*

On February 24, 2020, Dr. Graham responded to three written questions that Mr. Posey's attorney submitted to him to clarify his (Dr. Graham's) 2015 pain assessment. (Doc. 10-18, p. 96).  The first question asked whether Dr. Graham would expect Mr. Posey "[g]iven the nature and severity of his medical condition, . . . to have at least 2 or more days per month in which he would have the level of pain that would be distracting to adequate performance of daily activities and/or work."  (Doc. 10-18, p. 96).  Dr. Graham responded in writing: "Yes, I would expect his pain would prevent him from adequately performing daily activities and/or work more than two days per month."  (Doc. 10-18, p. 96).

The second written question regarded the note that Dr. Graham made on the July 29, 2015 "Clinical Assessment of Pain":  "pt. states he has 2 screws 'broken' from prior lumbar surgery. CT from 2/28/2014 doesn't show this. Dr. Givhan may have more recent imagery."  (Doc. 10-18, p. 96).  Mr. Posey's attorney provided to Dr. Graham a copy of the April 21, 2015 lumbar myelogram and Dr. Givhan's office notes, confirming the two broken pedicle screws.  Mr. Posey's attorney's asked:  "If you would have had those findings available to you at the time you completed the 'Clinical Assessment of Pain' questionnaire, would those findings have resulted in

19

a different assessment of Mr. Posey's pain at the time?" (Doc. 10-18, p. 96).  Dr. Graham responded in writing:  "Yes, broken pedicle screws at the S1 level [would] likely be painful and can result in failure of the fusion with resultant, continued pain." (Doc. 10-8, p. 96).

The third question asked Dr. Graham whether his assessment of Mr. Posey's pain had changed since his 2015 assessment. (Doc. 10-8, p. 97). Dr. Graham responded:  "Yes, I think Mr. Posey's pain routinely affects him with activities of daily living and/or work.  I think pain will continue to be a significant element in this person's life."  (Doc. 10-8, p. 97).

### *Mr. Posey's Administrative Hearing*

 The ALJ held Mr. Posey's administrative hearing on February 27, 2020. (Doc. 10-3, pp. 32-55).  At the beginning of the hearing, Mr. Posey's attorney asked the ALJ to reopen Mr. Posey's 2015 disability case based on "new and material evidence that directly contradicts the finding that [the ALJ] made in [her] previous decision" denying disability benefits.  (Doc. 10-3, p. 35).  The ALJ denied that motion because she did not "find the evidence new and material that would justify reopening the prior decision."  (Doc. 10-3, p. 35).

Mr. Posey testified that he had not worked since the date of filing for SSI on May 22, 2018.  (Doc. 10-3, p. 36).  His last job was as a welder at Ox Bodies.  (Doc. 10-3, p. 37).  Mr. Posey testified that he lived with his wife and three daughters in a

tiny house attached to his mother and father's house. (Doc. 10-3, pp. 36-38). Mr. Posey stated that because of his pain, he could not pick up his daughter who weighed fifteen pounds, and that he could hold her only when seated. (Doc. 10-3, p. 46). Mr. Posey testified that he had a driver's license and drove when he could. (Doc. 10-3, p. 37). Mr. Posey testified that he smoked about a "pack and a half" of cigarettes a day that his parents bought for him and that he had gained about 60 to 70 pounds since applying for SSI. (Doc. 10-3, p. 38).

Mr. Posey stated that his back pain was his most severe physical issue. (Doc. 10-3, pp. 38-39). He testified that he had severe, constant back pain that he rated as a "seven on good days, eight on bad days." (Doc. 10-3, p. 39). Mr. Posey testified that he had "more than two" bad days a month where his pain was an eight out of ten, and that it had "gotten to where it [was] almost every day." (Doc. 10-3, p. 48). He testified that he took Percocet typically in the morning to get out of bed and "every day for three times a day" to cope with pain. (Doc. 10-3, pp. 39-40). Mr. Posey testified that his pain affected his ability to concentrate, and he could watch television only for about fifteen minutes. (Doc. 10-3, p. 43).

Mr. Posey testified that his legs would "go numb" when he walked a couple of feet and that the numbness occurred mainly in his left leg but sometimes in his right leg. (Doc. 10-3, p. 40). Mr. Posey also testified that he could stand for only five to ten minutes and sit for about the same amount of time. (Doc. 10-3, p. 43).

Mr. Posey testified that he could lift only about eight to ten pounds and that he could pick up a gallon of milk but could not carry it very far.  (Doc. 10-3, pp. 44, 47).

Regarding his daily activities, Mr. Posey testified that he needed help showering and putting on his shoes.  He stated that he tried to do chores like cooking and cleaning but could cook only quick things and do a small amount of cleaning before he had to sit down.  (Doc. 10-3, pp. 44-45).  Mr. Posey testified that he could not bend over and pick things up from the floor because of his pain, and he used a hand grabber to lift things.  (Doc. 10-3, p. 47).

Mr. Posey testified that, in a typical week, he had to lie down six days a week, three to four times a day for ten to thirty minutes because of his pain.  (Doc. 10-3, p. 48).  Mr. Posey testified that he could walk only a few feet, and he had to stop multiple times on his way from his car to the hearing.  (Doc. 10-3, p. 49).

Ms. Froneberger testified as the vocational expert at Mr. Posey's administrative hearing.  (Doc. 10-3, p. 49).  She classified Mr. Posey's past work as a welder/fitter as medium work with an SVP of seven.  (Doc. 10-3, p. 49).

The ALJ's first hypothetical to the Ms. Froneberger assumed a claimant of the "same vocational background as [Mr. Posey]", except that he could not operate foot controls; could not "climb[] stairs, ladders, ropes, or scaffolds"; could not kneel, crouch, or crawl; and could not be exposed to "excessive vibrations, unprotected heights, or hazardous machinery."  (Doc. 10-3, p. 49).  Ms. Froneberger testified that

this individual could perform light exertion SVP 2 jobs as a marker, with 300,000 available jobs nationally; a router, with 50,000 available jobs nationally; and a photocopying machine operator, with 15,000 available jobs nationally.  (Doc. 10-3, pp. 49-50).

The second hypothetical that the ALJ posed consisted of an individual with the same vocational background and limitations as those posed in the first hypothetical, with the additional limitations of "no exposure to extreme cold, extreme heat, or extreme humidity"; avoid concentrated exposure to pulmonary irritants like "fumes, odors, dust, gases, poorly ventilated areas, and [] chemicals"; and must have a sit/stand option for up to one hour.  (Doc. 10-3, p. 50).  Ms. Froneberger testified that the previous jobs of photocopying machine operator, marker, and router would be available, but with a fifty-percent reduction in the available numbers of marker and router jobs.  (Doc. 10-3, p. 50).

The final hypothetical the ALJ posed to Ms. Froneberger contained the same vocational background and limitations as the second hypothetical with the additional limitations of "frequent but not constant fine and gross manipulation." (Doc. 10-3, p. 50).  Ms. Froneberger testified that the same jobs and approximate numbers of jobs would be available to this hypothetical individual as in the second hypothetical. (Doc. 10-3, p. 50).

Ms. Froneberger testified that for issues not specifically covered by the DOT, such as the sit/stand option and climbing ladders, stairs, ropes, and scaffolds, she based her findings on her professional experience, education, and training. (Doc. 10-3, p. 51). Ms. Froneberger clarified that the individual in the hypothetical could alternate between sitting, standing, and walking in intervals for up to an hour unless he was walking away from his workstation and abandoning his work tasks. (Doc. 10-3, p. 52). Ms. Froneberger also testified that a person who could sit for only thirty minutes, walk for ten minutes, and stand for ten minutes could not perform these jobs. (Doc. 10-3, p. 53). Ms. Froneberger testified that a person that would be off task or lying down fifteen percent or more of the workday or that would be absent more than one day a month would be precluded from any work. (Doc. 10-3, p. 54).

## THE ALJ'S DECISION

The ALJ found that Mr. Posey had not engaged in substantial gainful activity since the application date of May 11, 2018. (Doc. 10-3, p. 19). The ALJ determined that Mr. Posey suffered from the severe impairments of lumbar fusion L4-L5-S1 with broken screw at L1 and obesity. (Doc. 10-3, p. 19).[8] The ALJ also determined that Mr. Posey had the non-severe impairments of carpal tunnel syndrome, hypertension, obstructive sleep apnea, gastroesophageal reflux disease, status post

_____

[8] The broken screws are at S1, not L1. (Doc. 10-8, p. 24). The L1 finding may be a typographical error.

cholecystectomy, and asthma. (Doc. 10-3, p. 19). Based on a review of the medical evidence, the ALJ concluded that Mr. Posey did not have an impairment or a combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 10-3, p. 20).

Considering Mr. Posey's impairments, the ALJ evaluated Mr. Posey's residual functional capacity or RFC. (Doc. 10-3, p. 21). The ALJ determined that Mr. Posey had the RFC to:

> perform light work . . . except: the claimant is unable to climb stairs, ladders, ropes or scaffolds; the claimant cannot kneel, crouch, or crawl; [Mr. Posey] should have no exposure to excessive vibration, unprotected heights, or hazardous machinery; [Mr. Posey] should have no exposure to extreme cold, extreme heat, or extreme humidity; [Mr. Posey] should avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, gases, poorly ventilated areas, and chemicals.

(Doc. 10-3, p. 21).

Based on this RFC, the ALJ concluded that Mr. Posey was unable to perform his past relevant work as a welder/fitter, which is skilled work at a medium level of exertion. (Doc. 10-3, p. 24). Relying on testimony from the vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mr. Posey could perform, including marker, router, and photocopying machine operator. (Doc. 10-3, p. 25). Accordingly, the ALJ determined that Mr. Posey had not been under a disability as defined by the Social Security Act since he filed his May 11, 2018 application. (Doc. 10-3, p. 25).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).   If the ALJ's decision is supported by substantial evidence, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, — Fed. Appx. —, 2015 WL 795089, at *2 (11th Cir. Feb. 26, 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the district court finds an

error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Application of the Eleventh Circuit's Pain Standard*

Mr. Posey contends that the ALJ did not properly apply the Eleventh Circuit pain standard, and he argues that substantial evidence does not support the ALJ's decision to discredit his subjective complaints of the limitations caused by his pain. The Court agrees.

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917. (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r,*

*Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*).  If the ALJ does not properly apply the three-part standard, reversal is appropriate.  *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability."  *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).    If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  The Commissioner must accept the claimant's testimony, as a matter of law, if the ALJ inadequately discredits the testimony.  *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

In evaluating a claimant's symptoms, the provisions of Social Security Regulation 16-3p apply.  SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including

the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4. Concerning the ALJ's burden when evaluating

a claimant's subjective symptoms, SSR 16-3p provides:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:
>
> (i)   [the claimant's] daily activities;
>
> (ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) [p]recipitating and aggravating factors;
>
> (iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Mr. Posey's severe impairments of lumbar fusion at L4-L5-S1 with broken pedicle screws and obesity "could reasonably be expected to cause [Mr. Posey's] alleged symptoms" but concluded that the "intensity, persistence and limiting effects of [Mr. Posey's] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Doc. 10-3, p. 22).  The ALJ discounted Mr. Posey's description of his pain and physical limitations based on an incomplete reading of Mr. Posey's medical records.

The ALJ stated that treatment records from Dr. Graham showed that Mr. Posey was "doing well on (his) medications, which include [O]xycodone, Flexeril, and Lyrica," citing Mr. Posey's May 8, 2019 medical record.  (Doc. 10-3, p. 22). True, Mr. Posey reported that information during that May 2019 appointment, but Mr. Posey also reported during that appointment that while taking all those medications, he had a pain level of 7/10.  (Doc. 10-10, pp. 82-85).  Mr. Posey testified at the hearing that a pain level of 7/10 constituted a "good" day controlling his pain, (Doc. 10-3, p. 39), which could explain Mr. Posey's comment that he was

doing well on his medication that day.  The ALJ omitted from her analysis Mr. Posey's testimony from the hearing about his good and bad days.

The ALJ stated that records from Dr. Graham indicated that Mr. Posey's pain was "generally well-controlled with medication," broadly citing Mr. Posey's medical records.  (Doc. 10-3, p. 23).  The ALJ did not explain how she reached this conclusion, and the medical records do not suggest that Mr. Posey's pain was well-controlled with medication.  Instead, the medical records show that despite consistently taking either Oxycodone or Percocet, Flexeril, and Lyrica, after Mr. Posey fell and broke two pedicle screws in 2015, the severity of his pain fluctuated from a 6/10 to a 9/10 on the pain scale from 2015 through 2020.  (*See* Docs. 10-8, 10-9, 10-10).  Mr. Posey testified at the February 2020 administrative hearing that he had more than two days each month where the severity of his pain was an 8/10, which he described as a bad day.  (Doc. 10-3, p. 48).  Mr. Posey often reported back pain and tingling, numbness, and weakness in his legs.

The ALJ overlooked the September 2019 treatment record which reflects that Dr. Graham ordered an Orthocor PEMF device for Mr. Posey's pain because the prescription pain medications provided Mr. Posey "minimal relief."  (Doc. 10-10, p. 92).  The ALJ also omitted from her discussion Dr. Graham's November 2019 recommendation of a SCS trial for Mr. Posey if surgery to remove the broken pedicle screws was not an option because even with prescription medication, Mr. Posey

suffered "constantly" from low back pain that varied "from sharp to dull" and radiated into his legs.  (Doc. 10-10, pp. 94, 96).  Mr. Posey's consistent reports of severe pain while complying with prescription medications and Dr. Graham's treatment records do not support the ALJ's conclusion that Mr. Posey's medications controlled his pain well.

The ALJ discounted Mr. Posey's subjective statements because the "record suggests that [Mr. Posey] received relief form a lumbar back brace prescribed by Dr. Graham, as he reported that it 'help[ed] to an extent,'" citing Dr. Graham's treatment note from the May 2019 appointment.  (Doc. 10-3, p. 22).  The ALJ highlighted the fact that during this appointment, Mr. Posey stated the brace helped his pain "to an extent."  The ALJ overlooked Mr. Posey's statement to Dr. Graham during the January 2020 appointment that his lower back pain was worse, and "the brace [did] not help him."  (Doc. 10-10, p. 98).

The ALJ noted that Dr. Graham's physical examinations showed that Mr. Posey had normal muscle strength and reflexes and no muscle atrophy.  (Doc. 10-3, p. 22).  But those findings do not negate Mr. Posey's reports of severe lower back pain which Dr. Graham and Dr. Givhan attributed to broken pedicle screws in Mr. Posey's lower back.  The ALJ did not mention Dr. Graham's opinion and CRNP Hester's statements in Mr. Posey's records that the broken pedicle screws were a

significant cause of Mr. Posey's constant low back and leg pain. (Doc. 10-8, pp. 132, 140).

The ALJ pointed out that Mr. Posey's 2015 MRI showed "no acute abnormality with stable fusion changes with chronically fractured L5 pedicle screws." (Doc. 10-3, p. 23). Regarding the fractured pedicle screws, the ALJ noted that the "CT myelogram did not show any lateralizing disc herniation and the fractured screws at L5-S1 appeared to have spontaneously fused." (Doc. 10-3, p. 23). The ALJ noted that Dr. Givhan "recommended no further surgical intervention." (Doc. 10-3, p. 23). Missing from this analysis is Dr. Givhan's assessment of Mr. Posey's pain. Dr. Givhan "strongly recommend[ed] against hardware removal or any other intervention in this particular case" because of the spontaneous fusion and stated that Mr. Posey "ha[d] a long history of chronic back pain, and he [was] likely going to have this for the rest of his life . . . ." (Doc. 10-8, p. 13). Dr. Graham repeatedly recommended that Mr. Posey seek a second opinion regarding surgical removal of the broken pedicle screws to reduce the severity of Mr. Posey's pain.

An ALJ may not cherry-pick evidence in an applicant's medical records to support a conclusion. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986*)* ("It is not enough to discover a piece of evidence which supports [a] decision, but to disregard other contrary evidence[,]" and a decision is not supported where it was

33

reached "by focusing upon one aspect of the evidence and ignoring other parts of the record."); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). Here, the ALJ focused on isolated aspects of the medical record and ignored the parts that support Mr. Posey's subjective complaints of pain.

In evaluating a claimant's reported symptoms, the ALJ had to consider Mr. Posey's daily activities. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In his July 2018 "Function Report-Adult," Mr. Posey indicated that, because of his physical impairments and pain, he needed help bathing and putting on his shoes. (Doc. 10-7, p. 17). He reported that he could make a "simple sandwich or a frozen meal or hot pocket snack, but someone else ha[d] to clean up because [he] [could not] stand long enough." (Doc. 10-7, p. 18). Mr. Posey indicated that he could not help his wife with simple chores; could not do yardwork; and could shop in stores only if he used a mobile cart. (Doc. 10-7, pp. 18-19). Mr. Posey's testimony at the hearing was consistent with his statements in his function report. (Doc. 10-3, pp. 44-45). Mr. Posey testified at the hearing that his back pain prevented him from lifting his daughter who weighed 15 pounds. (Doc. 10-3, p. 46). The ALJ did not discuss Mr. Posey's description of the way in which his pain affected his activities of daily living.

The Court cannot ascertain from the ALJ's opinion whether she considered Mr. Posey's reported limitations in his daily activities.

The ALJ had to consider measures that Mr. Posey used to try to reduce his pain. *See* 20 C.F.R. §§ 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ did not mention Mr. Posey's testimony regarding his need to lay down several times each day to help alleviate his pain.  (Doc. 10-3, pp. 47-48).

The ALJ relied on Dr. Sellman's opinion that Mr. Posey could perform work at the light exertional level because the ALJ found that opinion consistent with the treatment notes and medical evidence in the record.  (Doc. 10-3, p. 23).  Dr. Sellman conducted her one-time administrative assessment and review of the Mr. Posey's medical records in July 2018; there are several relevant records that post-date Dr. Sellman's assessment. The ALJ found persuasive Dr. Sellman's opinion that Mr. Posey could occasionally lift 20 pounds, but the ALJ did not acknowledge Mr. Posey's testimony at the hearing in 2020 that he could not lift his 15-pound daughter because of his pain.

For all these reasons, the Court concludes that the ALJ did not properly apply the Eleventh Circuit pain standard, and substantial evidence does not support her conclusions on this issue.  On remand, the ALJ must consider the entire case record and give "specific reasons for the weight given" to Mr. Posey's symptoms and those

reasons must be "consistent with and supported by the evidence." *See* SSR 16-3, 2017 WL 5180304, at *10.

### *Assessment of Dr. Graham's Medical Opinion*

Although the Court will remand this case on the pain standard issue, the Court has concerns about the ALJ's assessment of Dr. Graham's 2020 medical opinion that Mr. Posey's severe pain "would prevent him from adequately performing daily activities and/or work more than two days a month." (Doc. 10-18, p. 96). In considering a medical opinion, the ALJ will consider five factors when evaluating the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and "other factors." 20 C.F.R. § 416.920c(1)-(5).[9] The most important factors are supportability and consistency, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] determination or decision." 20 C.F.R. § 416.920c(b)(2).[10]

---

[9] Mr. Posey contends that the ALJ improperly evaluated the opinion of Dr. Graham under the treating-physician rule, which required ALJs to give a treating physician's opinion great weight unless good cause existed to give it less weight. (Doc. 15, p. 3-4; Doc. 19, p. 2) (citing *Winschel v. Commissioner of Social Sec.*, 631 F.3d 1176 (11th Cir. 2011), and *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982)). Mr. Posey's reliance on the treating physician rule is misplaced. Because Mr. Posey filed his disability application after March 27, 2017, the Court must apply the new regulation found in 20 C.F.R. § 416.920c, which abrogated the treating-physician rule. *See Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 894 (11th Cir. 2022).

[10] An ALJ does not have to articulate how she considered the other three factors. 20 C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical opinions . . . in your case record.").

The ALJ did not provide adequate reasoning as to the supportability or consistency of Dr. Graham's 2020 medical opinion regarding the limiting effects of Mr. Posey's back pain.  Regarding Dr. Graham's 2020 "amendments to his 'Clinical Assessment of Pain," the ALJ stated:

> Dr. Graham's amendments to his "Clinical Assessment of Pain" are inconsistent with his treatment records and are therefore not persuasive (Exhibit C21F). Dr. Graham[] speculated that the claimant's "pain would prevent him from adequately performing daily activities and/or work more than 2 days per month" (Exhibit C21F). Social Security regulations require that the Administrative Law Judge determine a function-by-function residual functional capacity based on the evidence and on actual impairment caused functional limitations. Frequent absenteeism from work does not constitute a functional limitation. Moreover, there is no evidence that the claimant has any disabling impairment that would significantly affect his ability to perform all work, or cause him to regularly be absent from work.  Indeed, the evidence from Dr. Graham indicates that the claimant's pain is generally well-controlled with medication (Exhibit C17F).

(Doc. 10-3, p. 24).  The ALJ's conclusory statements that Dr. Graham's opinions are speculative and not supported by the record do not satisfy the ALJ's obligation under the new regulations.  Other than a conclusory statement, the ALJ did not explain why Dr. Graham's updated opinion was speculative.

The ALJ also did not explain how she assessed either the consistency or supportability of Dr. Graham's opinions regarding the limitations caused by Mr. Posey's back pain.  The ALJ relied on language in Dr. Graham's treatment notes that indicates that Mr. Posey's pain was controlled by medication.  As discussed above, Mr. Posey's consistent reports of severe pain at levels of 7-9/10 and Dr.

37

Graham's treatment records provide context for notes that refer to controlled pain. The ALJ's conclusion that "frequent absenteeism from work does not constitute a functional limitation" does not demonstrate the supportability or consistency of Dr. Graham's opinion.

The ALJ provided "broad conclusions without explaining h[er] analysis regarding consistency and supportability." *See Works v. Saul*, No. 4:19-cv-01515-MHH, 2021 WL 690126, at *15 (N.D. Ala. Feb. 23, 2021). An ALJ does not satisfy her obligation to "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions", 20 C.F.R. § 416.920c(b)(2), by stating only that a medical opinion is speculative or generally inconsistent with the medical record. Though 20 C.F.R. § 416.920c(b) provides that as a practical matter, an ALJ cannot articulate for each medical source how the ALJ considered all of the § 416.920c(c) factors, § 416.920c(b) requires more than a conclusory statement, at least with respect to the supportability and consistency factors so that a reviewing court may make a meaningful assessment of a challenge to an ALJ's evaluation of the persuasiveness of various medical opinions. On remand, the ALJ should explain the supportability and consistency factors as required by the regulation.

### Improper Appointment of ALJ and Failure of ALJ to Reopen Mr. Posey's 2015 Disability Application

Citing *Lucia v. SEC*, 138 S. Ct. 2044, 2049 (2018) and *Carr v. Saul*, 141 S. Ct. 1352, 1357 (2021), Mr. Posey contends that the Commissioner erred by assigning

his 2018 disability application to ALJ Helmer after she decided his 2015 application without proper constitutional authority. (Doc. 15, p. 13; Doc. 19, p. 10). Mr. Posey also argues that the ALJ erred in failing to reopen his 2015 disability application, given that ALJ Helmer lacked authority to render a decision in that case.

The Supreme Court in *Lucia* held that the Security and Exchange Commissioner's ALJs were inferior officers who had not been properly constitutionally appointed at the time of Mr. Lucia's administrative proceeding.[11] Because Mr. Lucia timely challenged the constitutionality of the appointment during his appeal to the SEC, the Supreme Court held that the remedy for the constitutional violation was remand to the agency for a new hearing before a properly appointed officer, and the properly appointed officer could not be the officer who previously heard the case. *Lucia*, 138 S. Ct. at 2055; *see Gibson v. Sec. & Exch. Comm'n*, 795 Fed. Appx. 753, 754 (11th Cir. 2019).

Like the SEC ALJs at issue in *Lucia*, "SSA ALJs had been selected by lower level staff rather than appointed by the head of the agency," in violation of the Appointments Clause. *Carr v. Saul*, 141 S. Ct. 1352, 1357 (2021). On July 16, 2018, a few weeks after the Court decided *Lucia*, the SSA Acting Commissioner

---

[11] The Appointments Clause of the United States Constitution provides the exclusive methods to appoint "Officers of the United States, a class of government officials distinct from mere employees." *Lucia*, 138 S. Ct. at 2049. "Only the President, a court of law, or a head of a department" can appoint officers. *Lucia*, 138 S. Ct. at 2051.

"pre-emptively 'address[ed] any Appointments Clause questions involving Social Security claims' by 'ratif[ying] the appointments' of all SSA ALJs and 'approv[ing] those appointments as her own.'" *Carr*, 141 S. Ct. at 1357 (citing 84 Fed. Reg. 9583 (2019)).  As a result, in 2019, "the SSA issued a ruling stating that the Appeals Council should, in response to timely requests for Appeals Council review, vacate preratification ALJ decisions and provide fresh review by a properly appointed adjudicator." *Carr*, 141 S. Ct. at 1357 (citing 84 Fed. Reg. 9583 (2019)).  Claimants who did not raise their Appointments Clause challenge in their proceedings before the ALJ or Appeals Council received no remedy.  *Carr*, 141 S. Ct. at 1357.

On April 22, 2021, in *Carr*, the Supreme Court held that a claimant's failure to raise an Appointments Clause challenge during administrative proceedings would not a forfeit the challenge. *Carr*, 141 S. Ct. at 1361-62.  The Supreme Court decided that "claimants who raise [an Appointment Clause] issue for the first time in federal court are not untimely in doing so," *Carr*, 141 S. Ct. at 1362, but the claimants in *Carr* raised their Appointments Clause challenges in timely-filed district court appeals of decisions by the ALJs who were not constitutionally appointed at the time of those decisions.  *Carr*, 141 S. Ct. at 1358 n.2 (quoting 42 U.S.C. § 405(g)).

In both *Lucia* and *Carr*, the ALJs were improperly appointed when they rendered the decision under review in federal court.  Here, Mr. Posey did not appeal ALJ Helmer's denial of his 2015 application after the Appeals Council denied

review. Instead, he filed a new application in 2018. The final decision under review in this appeal is ALJ Helmer's 2020 decision, which she rendered after the Acting Commissioner ratified ALJ Helmer's appointment in 2018. An Appointment Clause challenge in this appeal is unavailing because ALJ Helmer was constitutionally appointed during all aspects of the 2020 decision under review in this case. *See Raper v. Comm'r of Soc. Sec.*, No. 5:20-cv-597-PRL, 2022 WL 1078128, at *6 (M.D. Fla. Mar. 25, 2022) (rejecting a similar argument, even where the same ALJ issued an earlier decision in the same case prior to the ratification by the Acting Commissioner).

Nevertheless, because the Court is remanding this case on the pain standard issue, ALJ Helmer could decide Mr. Posey's disability application a third time. As the Supreme Court indicated in *Lucia*, an ALJ who issued a decision on the merits while lacking the proper constitutional authority but later received a constitutional appointment "cannot be expected to consider the matter as though [she] had not adjudicated it before." *Lucia*, 138 S. Ct. at 2055. Although Mr. Posey did not appeal the denial of his 2015 application to the federal district court and timely raise the appointment issue in that case, on remand in this case, the Commissioner should consider assigning Mr. Posey's case to a different ALJ.

Regarding ALJ Helmer's refusal to re-open Mr. Posey's 2015 disability application, the Court does not have jurisdiction to decide that issue. A district

court's "jurisdiction to review claims arising under the Social Security Act is limited by 42 U.S.C. § 405(g)." *Kimbril v. Soc. Sec. Admin. Comm'r*, —Fed. Appx.—, 2023 WL 3487764, at * 1 (11th Cir. May 17, 2023) (citing *Cash v. Barnhart*, 327 F.3d 1252, 1255 (11th Cir. 2003)).  Section 405(g) permits review in federal district court "only after final decision of the Commissioner of Social Security made after a hearing."  42 U.S.C. § 405(g).

An ALJ's "denial of a request to re-open a final and binding determination, however, is not subject to the administrative review process [in federal district court] because such a request is not a 'final decision . . . made after a hearing' under § 405(g)."  *Kimbrel*, 2023 WL 3487764, at *1 (citing 20 C.F.R. § 404.903(1)).  Consequently, "federal courts generally lack subject matter jurisdiction to review a denial of a request to reopen."  *Kimbrel*, 2023 WL 3487764, at *1 (citing *Califano v. Sanders*, 430 U.S. 99 (1977)).  An exception exists where the claimant "raises a colorable constitutional claim."  *Kimbrel*, 2023 WL 3487764, at *1 (citing *Califano*, 430 U.S. at 108-09).  A "constitutional claim relating to the first application is insufficient to confer subject matter jurisdiction over [an] appeal of the reopening decision.  The constitutional issue must concern the proceeding at which the decision not to reopen was made."  *Kimbrel*, 2023 WL 3487764, at *1 (quoting *Cherry v. Heckler*, 760 F.2d 1186, 1190 n.4 (11th Cir. 1985), superseded on other grounds by 20 C.F.R. § 404.1520(a)(1992) (internal quotations omitted)).

Here, Mr. Posey's request to re-open his 2015 application was not based on an Appointments Clause claim. Instead, Mr. Posey's request to re-open his 2015 application involved new medical evidence that he claimed supported his carpel tunnel diagnosis. (Doc. 10-3, p. 35). Mr. Posey did not raise the Appointments Clause constitutional issue until he filed his brief in this appeal on September 27, 2021. Even so, his Appointments Clause constitutional claim relates to the denial of his prior 2015 application by an ALJ who was not constitutionally appointed when she rendered her decision. Mr. Posey does not identify a constitutional issue involving the administrative proceedings for the 2018 application during which ALJ Helmer's denied his request to re-open based on alleged new medical evidence. Therefore, the Court lacks subject matter jurisdiction to decide this issue.

## CONCLUSION

For the reasons discussed above, the Court finds that the ALJ did not properly apply the pain standard, and substantial evidence does not support her findings. Accordingly, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this July 26, 2023.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE